926 P.2d 494

**STATE of Arizona, Appellee,**

v.

**Colette Renee DePIANO, Appellant.**

**No. CR–95–0099–PR.**

Supreme Court of Arizona,
En Banc.

Sept. 5, 1996.

Certiorari Denied Jan. 21, 1997.

See 117 S.Ct. 782.

---

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section and Crane McClennen, Assistant Attorney General, Phoenix, for State of Arizona.

Dean W. Trebesch, Maricopa County Public Defender by Terry J. Adams, Deputy Public Defender, Phoenix, and Brent E. Graham, former Deputy Public Defender, Mancos, CO, for Colette Renee DePiano.

## OPINION

MARTONE, Justice.

A despondent mother's attempt to commit suicide and infanticide by asphyxiation was interrupted by an alert neighbor. All survived and, fortunately, no one was injured. She was not charged with attempted murder but, instead, with two counts of intentional or knowing child abuse under A.R.S. § 13–3623(B)(1) which carries a much more severe sentence. Upon conviction, the court sentenced her to two consecutive 17 year prison terms which require her to serve the full 34 years before release. We are asked to decide whether this sentence is cruel and unusual under the federal and state constitu-

tions. We conclude that it is not. However, we also conclude, in the exercise of our statutory authority, that the sentence is excessive in light of the circumstances of this particular crime and thus reduce it to the minimum statutory mitigated term of 24 years.

## I. THE FACTS

Colette DePiano had been, by all accounts, a very good mother. Her husband deserted her shortly after her second child was born. Despite the difficulty of raising two boys while working as a flight attendant with America West Airlines, DePiano appeared to manage. A few years after her husband deserted her, she began dating a co-worker at America West. Six months later she was hospitalized for post-abortion psychological complications. About one month before the suicide-infanticide attempt, she broke up with her boyfriend. She moved out of the house they shared, although she had no income and no place to live. She stole $300 from her ex-boyfriend to pay bills. A friend allowed her to live rent-free at her Tempe house. She was depressed, upset, and disillusioned.

On October 16, 1991, DePiano went to dinner with some friends at America West and came home late. At 2:00 a.m., a neighbor woke up to the sound of what he thought was a washing machine. His bedroom was right next to DePiano's garage. After checking things out, the neighbor noticed that the noise was coming from a car in the garage. He knocked on the garage door and the front door, but got no answer. He called the police.

A Tempe police officer came out, went into the sealed garage and brought DePiano and her two children out to the front yard. The police and paramedics took them to the hospital where she told the attending physician that she was depressed and had attempted suicide.

At her child abuse trial, she denied she was trying to commit suicide and claimed that she was trying to fix her car. After closing arguments and before the jury returned its verdicts of guilty, she left town.

In a 2–1 decision, the court of appeals affirmed her convictions and sentence. *State v. DePiano,* 187 Ariz. 41, 926 P.2d 508 (App.1995). We granted review on whether the sentence was constitutional and ordered supplemental briefing to consider whether we should reduce DePiano's sentence under A.R.S. § 13–4037(B), which authorizes the court to reduce sentences that, although constitutional, are otherwise excessive under the facts of a given case.

## II. CRUEL AND UNUSUAL PUNISHMENT

DePiano's sentence of 34 years is the result of the confluence of three separate sentencing enhancements. First, although most class 2 felonies then carried a 7 year presumptive term, A.R.S. § 13–701 (1989), intentional or knowing child abuse carried a presumptive term of 17 years. A.R.S §§ 13–604.01(B), 13–3623(B)(1). Second, A.R.S. § 13–604.01(E) requires that persons convicted of child abuse must serve the entire term. Third, sentences imposed for intentional child abuse, where the victim is under 15 years of age, must be served consecutively. A.R.S. § 13–604.01(J) (now A.R.S. § 13–604.01(I)). DePiano argues that her resulting sentence of 34 straight years without the possibility of release violates the prohibition against cruel and unusual punishment contained in the Eighth Amendment to the United States Constitution and art. 2, § 15 of the Arizona Constitution.

While it is clear that a cruel and unusual sentence violates both constitutions, what is cruel and unusual is not so clear. The United States Supreme Court addressed this issue in *Harmelin v. Michigan,* 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991). Harmelin had been convicted of possessing 672 grams of cocaine and was sentenced to life imprisonment without possibility of parole. Although there was no majority opinion, it was the judgment of the Court that the sentence did not violate the Eighth Amendment. Justice Kennedy's plurality opinion was the closest thing to an opinion of the Court. Under his view, the Eighth Amendment "forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Id.* at 1001, 111 S.Ct. at 2705. If a sentence raises an inference of gross dispro-

portionality, an intra-jurisdictional and inter-jurisdictional analysis of similar crimes is appropriate to validate the inference. *Id.* at 1005, 111 S.Ct. at 2707. If no such inference of gross disproportionality arises, no intra- or inter-jurisdictional analysis is required. The plurality concluded that a life sentence without parole for the possession of 672 grams of cocaine was constitutional. The plurality focused on the offense generally, without analyzing the particular circumstances of the crime or the offender. Because of the gravity of the offense, and the correlation between drugs and crime, particularly violent crime, "the Michigan Legislature could with reason conclude that the threat posed to the individual and society by possession of this large an amount of cocaine—in terms of violence, crime, and social displacement—is momentous enough to warrant the deterrence and retribution of a life sentence without parole." *Id.* at 1002–05, 111 S.Ct. at 2706–07. Having found that the sentence was not grossly disproportional, no inter- or intra-jurisdictional analysis was required. *Id.* at 1005, 111 S.Ct. at 2707.

In *State v. Bartlett*, 171 Ariz. 302, 830 P.2d 823 (1992) (*Bartlett II*), this court agreed that, at least until the Supreme Court of the United States reached a majority on the issue, it would use the standard articulated by Justice Kennedy to resolve such questions under the Eighth Amendment. But three members of this court looked to the particular facts and circumstances of the crime and the offender in analyzing the threshold question of gross disproportionality. Two members of this court would have done what Justice Kennedy did, not look at the particular crime or the particular offender, but whether the offense generally poses a sufficient threat to warrant the sentence imposed.

■ We do not believe that *Bartlett II* is entitled to the sort of precedential value one ordinarily would associate with an opinion of this court. The court was almost equally divided on the meaning of a *plurality* opinion of the United States Supreme Court. We are thus left with two levels of informed speculation. The first is whether the plurality opinion in *Harmelin* would command a majority today. The second is whether the majority or the minority read *Harmelin* correctly in *Bartlett II*. We agree with *Bartlett II* that until the Supreme Court of the United States holds otherwise, we shall follow Justice Kennedy's plurality opinion. But we disapprove of that part of *Bartlett II* that concludes that Justice Kennedy's analysis would require an examination of the facts and circumstances of the particular crime and the particular offender. We agree with the minority in *Bartlett II* that the initial threshold disproportionality analysis is to be measured by the nature of the offense generally and not specifically. We think this is particularly true for serious violent offenses.

■ Under this framework of analysis, and turning to this case, child abuse is a serious violent crime. The abuse must occur under "[c]ircumstances likely to produce death or serious physical injury." A.R.S. § 13–3623(B)(1). Child abuse is a violent crime and probably a more severe offense than the possession of 672 grams of cocaine. If, under *Harmelin*, a life sentence without the possibility of parole is not grossly disproportional to the offense of possession of cocaine, *a fortiori*, a shorter sentence for a more severe offense is not grossly disproportional. Therefore, without looking at the particular circumstances surrounding her offense, we reject DePiano's claim that her sentence violates the Eighth Amendment to the United States Constitution and art. 2, § 15 of the Arizona Constitution.

## III. STATUTORY REDUCTION

■ DePiano's sentence is constitutional because the prohibition against cruel and unusual punishment embodies a very narrow proportionality principle. A sentence is cruel and unusual only where there is gross disproportionality between the crime generally and the sanction imposed by the legislature. We ordered supplemental briefing on whether DePiano's sentence should nevertheless be reduced under A.R.S. § 13–4037(B), which, in contrast to the Eighth Amendment, allows the court to look at the particular circumstances of the crime and the offender and reduce any sentence that it finds to be excessive, even though the sentence is constitutional. A.R.S. § 13–4037(B) provides:

Upon an appeal from the judgment or from the sentence on the ground that it is excessive, the court shall have the power to reduce the extent or duration of the punishment imposed, if, in its opinion, the conviction is proper, but the punishment imposed is greater than under the circumstances of the case ought to be inflicted. In such a case, the supreme court shall impose any legal sentence, not more severe than that originally imposed, which in its opinion is proper. Such sentence shall be enforced by the court from which the appeal was taken.

██ This court cannot engage in appellate sentencing. Nor can we ordinarily substitute our judgment for that of the trial judge. We cannot and would not micromanage the administration of criminal justice in Arizona. We have neither the competence nor the ability to do so. We thus exercise our power under this statute only with great caution. *E.g., State v. Patton*, 120 Ariz. 386, 388, 586 P.2d 635, 637 (1978); *State v. Killian*, 91 Ariz. 140, 142, 370 P.2d 287, 289 (1962). We will only reduce a sentence if it clearly appears to be too severe. *E.g., State v. Herrera*, 121 Ariz. 12, 15, 588 P.2d 305, 308 (1978). As we said in *Patton*, "[t]he power of this Court to modify sentences should further be tempered by the realization that a defendant appears in person before the trial judge, rendering that judge, in most instances, more able than ourselves to evaluate the defendant and his circumstances." 120 Ariz. at 388, 586 P.2d at 637.

Such cases will be rare. Indeed, until today, we had not seen such a case in years. Although her children were with her, the crime here is essentially a botched suicide. Her suicide note, uncorrected, reads in part:

To all the people who made my life somewhat bearable;

Although none of this makes much sense to you—

I just know that I cannot put my sons through the coldness + hate that goes on—People talk above love—what does that mean—your parents tell you your out of house when your 18—your spouse leaves + believes he doesn't need to pay child support—Your children look up to you—what do you have to offer—

Dear God—I've taken my sons with me in hopes that we'd be somewhere away from the place we are now . . .

To my Mom—You've instilled in me that raising children is a nightmare + all they do is grow up to resent you—That's all the appreciation I get huh,—a resentment—You don't even call me!—Boy—that really pisses me off—

Jeff[1]—I lived your life, your problems your confusion—I loved you—what a waste—

Jim[2]—what a loser you are for not helping me with the boys—I tried so hard to do it by myself—I tried so hard!—You bastard—how can anyone not want to see these two boys succeed—They deserve more than what I can offer as a single income family—Why couldn't you help us—Just with day care expenses—they're your kids—

God only know how much I believe in life—but I look around me + see everyone lying cheating stealing[.] no one has any morals—

I'm not a 90s person—I don't want my sons to be a part of the hate we all spread around—

They are beautiful and pure + no one will take that away from us—

We are descent + honest . . .

Jordan—You've been the best of friends—I love you with all my heart—I love you—I love you—You've been wonderful to us—

Jordan you of all people know how disheartened I am with the hatefulness of people—

People look at you tell you they love you + walk away—

This note, and all of the other matters of record leading up to this sad incident, illustrate that DePiano's suicide-infanticide attempt was motivated by despair, not the evil,

---

1. The boyfriend from whom she broke up a month and a half before her suicide-infanticide attempt.

2. Her husband at the time of the incident.

wicked, depraved, or otherwise bad state of mind one associates with child predators. Neither her depression nor her despair excuse her guilt, but we believe it is so mitigating here that it sets this case apart from the norm.

■ The trial court found her lack of a prior criminal record and the absence of injury to the children to be mitigating. But he found her two month flight after the verdict was announced to be aggravating. He believed these factors balanced out and sentenced her to the presumptive term. In the ordinary case, a presumptive sentence could well be indicated. But the sentence here was driven more by the confluence of a series of nondiscretionary sentencing enhancements than individual judgment tailored to this particular offense and offender. We do not criticize the trial judge. Given these enhancements, the range available to him was narrowly severe. But A.R.S. § 13–4037(B) gives this court the responsibility to put the sentence in context. Had this been a typical child abuse case, we would have left this defendant where we found her. But it is not. Even most first degree murderers are eligible for parole after 25 years. A.R.S. § 13–703. We believe a 34 year flat sentence is excessive for this case and therefore DePiano is entitled to some relief under A.R.S. § 13–4037(B).

■ Our authority to reduce an otherwise constitutional sentence is limited by § 13–4037(B) to "one within the statutory range enacted by the legislature." *State v. Bartlett*, 164 Ariz. 229, 241, 792 P.2d 692, 704 (1990) (*Bartlett I* ). We therefore give her only the relief we are authorized to give. We reduce her sentence to 24 years (two consecutive 12–year terms), the minimum mitigated term to which she could have been sentenced. Executive clemency is an avenue of potential further relief in the future. *Compare* Ariz. Const. art. 5, § 5 with A.R.S. § 13–604.01(E) (1989) (amended 1993).

## IV. DISPOSITION

We vacate that part of the opinion of the court of appeals that relates to the cruel and unusual punishment issue. We affirm DePi-

ano's convictions, but under the authority of A.R.S. § 13–4037(B), the 17 year term of imprisonment for each count is reduced to 12 years for each of the two counts. The sentences in all other respects are affirmed, including the flat provisions of A.R.S. § 13–604.01(E) and the consecutive provisions of A.R.S. § 13–604.01(J).

MOELLER, Justice, concurring in part and dissenting in part.

We agree with Justice Martone's analysis under *Harmelin* and *Bartlett II* and with his conclusion that DePiano's sentence is not unconstitutionally cruel and unusual. We therefore join in that portion of his opinion designated "Part II. Cruel and Unusual Punishment." Because we disagree with the majority's decision to inject A.R.S. § 13–4037(B) into the case and to reduce DePiano's sentence, we dissent from that portion of the opinion designated "Part III. Statutory Reduction."

Colette Renee DePiano decided to kill herself and her two children on October 16, 1991. At the time, DePiano was experiencing financial problems and the breakup of a relationship. At approximately 2:00 a.m., DePiano placed towels along the base of the garage door at the house where she was staying. She got into her car with her children, Dustin (age three) and Dakota (age four), and started the engine. Fortunately, because the windows of the car were shut, the level of carbon monoxide in the car's interior rose slowly. Before DePiano and her two children were overcome by the fumes, a concerned neighbor heard the car's noise and alerted police. Responding officers entered the garage and rescued DePiano and the two children. Inside the car, police found a note, quoted in the majority opinion (maj. op. at 31, 926 P.2d at 498). DePiano claimed at trial that she had attempted neither suicide nor murder but was merely repairing her car. She maintained she had closed the garage door so as not to disturb her neighbors and the car's engine was running only because she was testing her repair work. She claimed that the children were with her because they had been

unable to sleep in the house. She explained that the towels along the garage door were there to limit the noise and because her children had been playing with them. Quite understandably, the jury rejected DePiano's absurd explanations and convicted her of two counts of child abuse.

While the jury was out, DePiano fled the jurisdiction for a period of weeks. At sentencing, the trial court found that DePiano's lack of a criminal record and the lack of physical injury to the children were mitigating factors. The judge found this mitigation counterbalanced by DePiano's flight following the verdict. Therefore, the judge imposed the presumptive term: two consecutive seventeen-year sentences.

The constitutional issue of whether her sentence was cruel and unusual was the only issue raised by DePiano in her petition for review. Thus, disposition of that issue would ordinarily have disposed of the case. However, the majority chose to inject a new, second issue into the case and *sua sponte* asked the parties to brief that issue; namely, the availability of a sentence reduction under A.R.S. § 13–4037(B). This new issue is the vehicle by which the majority now reduces DePiano's sentence. In addition to disagreeing with the decision to inject the new issue into this appeal, we disagree with the reduction of sentence for two reasons: 1) the majority finding of excessiveness is based on an unjustified construction of the child abuse statute and an improper appellate finding that DePiano suffered from depression; and 2) this case does not fall within the narrow range of cases in which Arizona appellate courts have historically invoked their statutory authority to reduce sentences under § 13–4037(B).

**1. Is the presumptive term imposed by the trial court "excessive"?**

**A. "Typical" Child Abuse**

In large part, the majority bases its conclusion that DePiano's sentence is excessive on the notion that this case is not a "typical" case of child abuse because it did not involve "the evil, wicked, depraved or otherwise bad state of mind one associates with child predators." *See* maj. op. at 31–32, 926 P.2d at

498–499. The majority's error begins with its characterization of the nature of the crime. The majority opinion states: "Although her children were with her, the crime here is essentially a botched suicide." Maj. op. at 31, 926 P.2d at 498. While it is clear that DePiano intended suicide, it is equally clear that she intended a double murder of her own children. She is not being sentenced for a "botched suicide." She is being sentenced for her "botched" acts of child abuse by which she intended to kill her children, a result averted only through a neighbor's watchfulness and prompt police intervention.

The majority also finds a legislative intent that we fail to discern in the statutory language or otherwise. A.R.S. § 13–3623(B) imposes substantial penalties on those who "having the care or custody" of a child, "intentionally or knowingly" place the child "in a situation where its person or health is endangered." The majority acknowledges that DePiano violated the statute but asserts that the statute was intended to apply to cases involving "child predators," which, we can only infer from the majority opinion, would involve the beating, torture, or molestation of children. *See* maj. op. at 31, 926 P.2d at 498. A "predator limitation," which appears nowhere in the statutory language, should not be grafted onto the statute by this court. The statute punishes caretakers who intentionally or knowingly place children in danger, and that is exactly what DePiano did.

The majority seems to suggest that sentencing under § 13–3623(B) should be based on some sliding scale of violence; if a person places a child in mortal danger without violence, she should receive a lesser punishment than one who otherwise places the child in the same mortal danger. We believe this conclusion, unsupported in the majority opinion by logic or precedent, is incorrect. A mother who cold-heartedly and with premeditation attempts to kill her children by asphyxiation, whether by suffocating them with a pillow, by poisoning them with car exhaust, or by putting them in a bag and dumping them in a public receptacle, is not, under the statute, less culpable than a mother who flies into a rage and beats her children. If there

is a public policy favoring one or the other for sentencing purposes, it should be expressed by the legislature.

### B. DePiano's Depression and Despair

The majority, in deciding that this is not a "typical" case of child abuse, also concludes that what sets this case apart from "typical" cases is DePiano's state of mind. *See* maj. op. at 31–32, 926 P.2d at 498–499. Though the majority acknowledges that "this court cannot engage in appellate sentencing," it nevertheless does so.

The majority emphasizes that while "[n]either [DePiano's] depression nor her despair excuse her guilt ... we believe it is so mitigating here that it sets this case apart from the norm." Maj. op. at 32, 926 P.2d at 499. The majority makes this factual finding without having seen or heard DePiano's testimony or that of the other witnesses. It thereby overturns the sentencing decision made by the trial judge, who was in a far better position to make such a finding but did not. Because the majority reduced DePiano's sentence based on its finding of depression and despair, we deal with that finding. This should not obscure the fact that it was inappropriate for the majority to make the finding in the first place.

The majority's finding of "depression [and] despair" is erroneous for two reasons. First, depression and despair could be found by trial or appellate courts in most, if not all, child abuse cases, particularly those involving abuse of one's own child. The very fact that a parent abuses his or her own child will nearly always raise a question of the emotional well-being of that parent. Surely, the legislature did not enact a legislative scheme with the intent that a mitigated sentence be the norm. As we explain shortly, we believe the majority's conclusion that "depression [and] despair" motivated DePiano's act is suspect based on this record. However, even if DePiano were depressed, the majority makes no effort to explain how this sets her apart from other child abusers, or why "depressed" or "despairing" child abusers should receive mitigated sentences.

Even assuming "depressed" child abusers should receive mitigated sentences, we dis-

agree with the majority's finding that DePiano was depressed, particularly when made, as it was here, as an initial matter on appeal. The majority uses DePiano's suicide note, in which she directed a diatribe of blame and bitterness at those she felt were responsible for her misery, to show that this "sad incident" was "essentially a botched suicide" motivated by extreme "depression [and] despair." *See* maj. op. at 31, 926 P.2d at 498. We disagree with this characterization. The letter reads, in part:

> Your parents tell you your [sic] out of the house when your 18—Your spouse leaves and believes he doesn't need to pay child support.... To my Mom—You've instilled in me that raising children is a nightmare and all they do is grow up to resent you—That's all the appreciation I get, huh,—a resentment—You don't even call me! Boy that pisses me off—Jeff—I lived your life, your problems, your confusion—I loved you—what a waste—Jim—What a loser you are for not helping me with the boys ... you bastard.... They deserve more than what I can offer as a single income family.

The note, in our view, is at least as aggravating as it is mitigating. It shows that DePiano not only blames all those around her for her problems but that she was willing to kill her own children because of her financial woes and resentments.

Admittedly, the emergency room physician who saw DePiano described her as depressed. *See* state's exhibit 26. The bare assertion that DePiano was acting depressed in the early morning hours *following* her suicide/infanticide attempt is hardly proof of her motivation *before* the attempt. It is not surprising or atypical that someone arrested for trying to murder her own children would act depressed. If we are to engage in fact-finding on appeal (an approach we wholeheartedly discourage), we need to look at all the evidence. When we do, it certainly does not show a depressed mood either subjectively or objectively.

DePiano's own testimony is that she felt fine during the period leading up to October 16, 1991. Her close friends did not report

any moodiness but instead testified that she seemed "upbeat," "normal," and "fine." Nor did DePiano withdraw from activity; she went out with her friends and co-workers the same night she attempted the killings. There is no evidence in the record of weight loss or gain, insomnia, psychomotor agitation, fatigue, or diminished ability to think which might support a finding of depression. Finally, DePiano's note makes very clear that it was not she whom she considered worthless but everyone else; her mother, her ex-boyfriend, her ex-husband, and "the coldness and hate that goes on." DePiano's absurd defense only underlines her complete lack of remorse or understanding of the impact of her crime. This court should not engage in psychoanalytical guesswork to probe the minds of those who commit criminal acts in order to adjust, *sua sponte*, the sentences of someone whom this court now deems to show signs of "depression [and] despair."

Nor should we follow a "no harm, no foul" approach to criminal law. Although the children suffered no immediate physical harm in this case, they would have been dead had DePiano's plan been executed successfully. Criminal statutes contain many examples of crimes designed to deter conduct which may not result in physical injury but which, by their nature, expose citizens to unwarranted risk. Aggravated assault and armed robbery, just to name two examples, are crimes involving significant penalties even though a person convicted of those crimes might truthfully argue that no one suffered physical injury in the course of the offense. *See* A.R.S. §§ 13–1203 to –1204, § 13–1902. This court undercuts the policy of many criminal statutes by implying that sentences for crimes that do not result in immediate physical harm should be mitigated. Such an approach overlooks not only the express statutory language but the potentially devastating emotional impact such crimes may inflict on their traumatized victims. On this record, we know nothing of the non-physical damage to the children. We do know that it is only through the children's good luck, the alertness of a neighbor, and the vigilance of the police that the children are alive today, whether emotionally scarred or not. Their survival owes nothing to their mother, the defendant.

**2. Assuming the validity of the majority's findings, is this court warranted in invoking its statutory power to reduce the sentence in this case?**

It is evident that we disagree with the majority's conclusion that DePiano's crime was not of the "typical" sort envisaged by § 13–4037(B) and with the majority's further conclusion that her presumptive sentence was inappropriate because she allegedly acted out of depression and despair. Even if the findings of the majority were correctly made at the appellate level, DePiano's presumptive sentence should not be reduced under § 13–4037(B).

The majority concedes that we should use our power to reduce a sentence under A.R.S. § 13–4037(B) only with great caution. (Maj. op. at 31, 926 P.2d at 498, citing *State v. Patton*, 120 Ariz. 386, 388, 586 P.2d 635, 637 (1978); *State v. Killian*, 91 Ariz. 140, 142, 370 P.2d 287, 289 (1962)). The majority notes, "we will only reduce a sentence if it clearly appears to be too severe." (Maj. op. at 31, 926 P.2d at 498, citing *State v. Herrera*, 121 Ariz. 12, 15, 588 P.2d 305, 308 (1978)). "The power of this court to modify sentences should further be tempered by the realization that a defendant appears in person before the trial judge, rendering that judge, in most instances, more able than ourselves to evaluate the defendant and his circumstances." (*See* maj. op. at 31, 926 P.2d at 498, citing *Patton*, 120 Ariz. at 388, 586 P.2d at 637).

Having noted the limited scope of the statute, the majority states: "Such cases [warranting reduction] will be rare. Indeed, until today, we had not seen such a case in years." Maj. op. at 31, 926 P.2d at 498. Perhaps this statement is intended to dissuade defendants from flooding Arizona appellate courts with requests for discretionary reduction of their sentences. A deluge of such requests is certainly otherwise readily foreseeable, for we can discern nothing concrete in the majority opinion that would distinguish this case from thousands of others in which severe sentences have been and are being imposed.

Arizona admittedly has a stern and complex sentencing regime with many mandatory sentences, enhanced sentences, aggravated sentences, flat-time sentences, and hard-time sentences. The majority's determination that statutorily authorized presumptive sentences are excessive because the crimes are not "typical" or because they were committed by depressed people offers no rational distinction between this case and many others. Thus, we may expect future claims for sentence reductions to be based on equally nebulous grounds.

Nor does the present case fit the narrow band of cases in which this court has exercised its statutory discretion in the past to reduce a sentence under § 13–4037(B). The facts of those cases granting relief under A.R.S. § 13–4037(B) stand in marked contrast to this one. For example, we have reduced a sentence as excessive because it exceeded the applicable statutory limits. *State v. Jennings,* 104 Ariz. 159, 160, 449 P.2d 938, 939 (1969). We have reduced sentences in cases which involved juvenile or youthful offenders. *State v. Telavera,* 76 Ariz. 183, 186–87, 261 P.2d 997, 999–1000 (1953) (seventeen-year-old defendant); *State v. Fierro,* 101 Ariz. 118, 121, 416 P.2d 551, 554 (1966) (seventeen-year-old defendant); *State v. Flores,* 108 Ariz. 231, 232, 495 P.2d 461, 462 (1972) (eighteen-year-old defendant); *State v. Seelen,* 107 Ariz. 256, 262, 485 P.2d 826, 832 (1971) (nineteen-year-old defendant). This court has also reduced sentences as excessive based on the errors and omissions of the sentencing court. *State v. Killian,* 91 Ariz. 140, 145, 370 P.2d 287, 292 (1962) (reducing a sentence for possession of marijuana largely because the trial court had been misled to believe that defendant was guilty of an unrelated rape); *State v. Tuggle,* 101 Ariz. 216, 219, 418 P.2d 372, 375 (1966) (remanding a case for resentencing because the sentencing court did not consider as mitigation defendant's age at the time of the crime (eighteen), his rehabilitation, and his restitution to both the victims and the state).

All of the foregoing cases in which sentences were reduced arose during the time when Arizona had indeterminate sentencing and trial judges had almost unlimited discretion in imposing sentences. Since presumptive determinate sentencing went into effect with the 1978 code, there have been only three reductions of sentencing under § 13–4037(B). One sentence was reduced because it exceeded the statutorily authorized punishment, *State v. Kerr,* 142 Ariz. 426, 435, 690 P.2d 145, 154 (App.1984). One set aside a $137,000 fine imposed on a defendant who had been convicted of a theft of under $500. *State v. Marquez–Sosa,* 161 Ariz. 500, 504, 779 P.2d 815, 819 (App.1989). The third such case was a contempt case rather than a criminal prosecution. *Hamilton v. Municipal Court,* 163 Ariz. 374, 380, 788 P.2d 107, 113 (App.1990). In contempt cases, there are no statutory guidelines for sentencing, and the court of appeals concluded that 120 hours of incarceration for failure of a lawyer to make a court appearance was excessive under the facts. *Id.*

Cases in which sentences have been reduced are extremely rare and have involved youthful defendants, mistakes or omissions at the trial level, relatively minor or nonviolent offenses, sentences beyond the statutory range, or other extenuating circumstances which show an abuse of discretion or clear error at the trial level. In this case, defendant is not youthful, but is, instead, a mature adult. She was twenty-nine years old when she committed the instant offense. Her crime was a very serious one which threatened to end the lives of two small children. The sentence imposed was within the permissible range and was the presumptive sentence which the legislature has deemed appropriate for acts of child abuse. No appellate court in Arizona has ever reduced a sentence for child abuse under § 13–4037(B). We would not do so now.

Until today, this court has maintained an appropriately high level of restraint under § 13–4037(B), as demonstrated by the very few cases in which sentences have been reduced in the past. Today's case stands as a disturbing anomaly amid that line of decisions and invites wholesale requests for appellate resentencing under the statute, assuming the statute survives.

For the foregoing reasons, we respectfully dissent from Part III of the majority opinion.

ROBERT J. CORCORAN, J. (Retired), concurs.

ZLAKET, Vice Chief Justice, concurring in part, dissenting in part.

I concur in Justice Martone's application of A.R.S. § 13–4037(B) to this case but disagree with his conclusion that DePiano's sentence is not cruel and unusual. I also find the "informed speculation" with which he analyzes this issue to be most peculiar and highly problematic. Whether a majority of the present United States Supreme Court would agree with the plurality opinion in *Harmelin v. Michigan*, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), is not at issue here. Furthermore, "whether the majority or the minority read *Harmelin* correctly in *Bartlett II*," *ante* at 30, 926 P.2d at 497 is an extremely inappropriate inquiry if the doctrine of stare decisis is to have continuing vitality in Arizona.

Only four years ago, a majority of this court held that *Harmelin v. Michigan* requires an examination of the circumstances of both the crime and the offender when deciding the constitutionality of a sentence:

> [T]he question of "gross disproportion" cannot be resolved without considering all of the factors that aggravate or mitigate the crime. To ignore the facts in determining whether a sentence is cruel and unusual would make the title of the statute ... determine the constitutionality of the sentence imposed. Surely, if this court has a responsibility to review the constitutionality of sentences under the eighth amendment, that duty requires us to apply the standards of the federal constitution to the facts of what occurred, no matter what label the legislature has attached to the criminalizing statute.

*State v. Bartlett*, 171 Ariz. 302, 307–08, 830 P.2d 823, 828–29, *cert. denied*, 506 U.S. 992, 113 S.Ct. 511, 121 L.Ed.2d 445 (1992) (footnote omitted) (*Bartlett II* ). The dissenters in *Bartlett II* lost the exact argument that today's opinion makes. Nothing has changed since that decision except the composition of this court. It is settled that "[m]ere dis-

agreement with those who preceded us, without more, is not an adequate reason to overrule precedent." *Wiley v. Industrial Comm'n of Arizona*, 174 Ariz. 94, 103, 847 P.2d 595, 604 (1993). Nevertheless, with remarkably little support, the opinion boldly proclaims:

> We do not believe that *Bartlett II* is entitled to the sort of precedential value one ordinarily would associate with an opinion of this court. The court was almost equally divided on the meaning of a *plurality* opinion of the United States Supreme Court. We are thus left with two levels of informed speculation. The first is whether the plurality opinion in *Harmelin* would command a majority today. The second is whether the majority or the minority read *Harmelin* correctly in *Bartlett II*.

*Ante* at 30, 926 P.2d at 497.

I respectfully submit that *Bartlett II* continues to be the law of this jurisdiction. The fact that it was not unanimous makes it no less deserving of "precedential value" than any other decision of this court. *See White v. Bateman*, 89 Ariz. 110, 114, 358 P.2d 712, 714 (1961). In the absence of compelling circumstances, stare decisis requires that we not overrule it. *Wiley*, 174 Ariz. at 103, 847 P.2d at 604.

Sound jurisprudential policy has caused us to abandon *substantive* precedent only when the reasons for it have ceased to exist or it appears to be clearly erroneous. *White*, 89 Ariz. at 114, 358 P.2d at 714; *see also State v. Salazar*, 173 Ariz. 399, 417, 844 P.2d 566, 584 (1992), *cert. denied*, 509 U.S. 912, 113 S.Ct. 3017, 125 L.Ed.2d 707 (1993). Neither basis is convincingly demonstrated here. Today's court is composed of one member of the three-person *Bartlett II* majority, the two dissenters, and two newer members. Significantly, the outcome is again 3–2, "almost equally divided on the meaning of [*Harmelin* ]." *Ante* at 30, 926 P.2d at 497. Because four present and past members of this court agree with *Bartlett II*, it can hardly be said that the decision is clearly erroneous or manifestly wrong. The fact that the United States Supreme Court denied certiorari adds further support to this conclusion. *See Ari-*

*zona v. Bartlett*, 506 U.S. 992, 113 S.Ct. 511, 121 L.Ed.2d 445 (1992). Moreover, since one member of today's majority has recently retired, we conceivably could soon witness another shift in the judicial winds, unless we remain "mindful that precedents of the court should not lightly be overruled and certainly not for reasons so inconsequential as a change of personnel on the court." *State v. Crowder*, 155 Ariz. 477, 483, 747 P.2d 1176, 1182 (1987) (Moeller, J., concurring in part, dissenting in part). Ironically, if Justice Martone's extraordinary approach to *Bartlett II* is valid, the present opinion would itself seem to be of highly questionable precedential value.

Not only am I unable to find a compelling reason to overrule *Bartlett II*, but I also concur that the facts and circumstances of the crime and the individual offender must be examined when determining gross disproportionality. It is the only logical way to apply punishment in a system rooted in concepts of justice and fairness. All defendants are not alike, just as all crimes, even if given the same label, are not identical. Child abuse is a prime example of an offense for which culpability arises from a full spectrum of conduct, ranging from neglectful parent to child predator. If this court were to ignore the particular facts and circumstances of each case, we would effectively be relinquishing our obligation to examine the constitutionality of sentences to the legislature, which has the power to define crimes, and the prosecutor, who has the authority to charge. *See Bartlett II*, 171 Ariz. at 309, 830 P.2d at 830 ("The eighth amendment, after all, is either a barrier to legislative action or nothing but empty words."); *Harmelin*, 501 U.S. at 996, 111 S.Ct. at 2702 (A "proportionality principle . . . has existed in our Eighth Amendment jurisprudence for 80 years."). Thus, the analysis approved in *Bartlett II* remains the proper one and, in this case, leads to the conclusion that DePiano's 34–year, day-for-day sentence is unconstitutional.

The threshold inquiry is whether defendant's sentence is grossly disproportionate to her crimes. "[P]roportionality review . . . should be informed by 'objective factors to the maximum possible extent.'" *Harmelin*, 501 U.S. at 1000, 111 S.Ct. at 2704 quoting *Rummel v. Estelle*, 445 U.S. 263, 274–75, 100 S.Ct. 1133, 1139, 63 L.Ed.2d 382 (1980). "*Harmelin* . . . did not criticize the factors utilized in [*Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) ] to determine whether the sentence is grossly disproportionate to the crime." *Bartlett II*, 171 Ariz. at 307, 830 P.2d at 828. These include, but are not limited to, the harm caused or threatened to the victim and society, as well as the culpability of the offender. We must also consider evidence tending to aggravate or mitigate the crime. *Id.*

DePiano was convicted of intentionally placing her children in a circumstance that was likely to cause death. *See* A.R.S. § 13–3623(B)(1). She and her sons were sitting in a running car within a closed garage. While the end result could have been tragic, it was not. The state argues that there is no disproportionality because defendant "attempted to kill her kids" and would be guilty of first degree murder had she succeeded. Putting aside the likelihood that she too would be dead under such a scenario, DePiano did not murder her children. Moreover, attempted murder was not the charge ultimately made by the prosecution, even though it was the basis upon which defendant was arrested. Most significantly, as the state conceded at oral argument, had this woman been convicted of attempted murder, her sentence would probably have been much less severe.

An expert witness testified that the conditions of the garage were "likely to cause death." However, the lack of physical effects on DePiano and her children, together with the low levels of carbon monoxide in their blood, show that they were not exposed to these conditions in any meaningful way. The expert concluded, and the evidence supports, that they were inside the car with the windows rolled up. According to the expert, for the 20–30 minutes of exposure to have been lethal, they needed to be outside the car *and* exposed to carbon monoxide levels 5 times as concentrated as it was when the police arrived.

The children were not physically harmed in any way by DePiano's actions. It further appears that they knew little or nothing of what was going on around them and suffered no significant emotional trauma *at the time.* Obviously, they must have experienced considerable mental distress when they were later taken from their mother and told what had occurred, but such evidence does not appear in this record and, in any event, would not be relevant to the present analysis.

Although one could argue that *Harmelin* involved a similarly nonviolent crime—possession of cocaine—the Supreme Court made a point of citing studies and statistics showing a link between drugs, violence, and harm to society. The Court noted that the defendant in that case possessed 672.5 grams of undiluted cocaine, potentially yielding between 32,500 and 65,000 doses. Other evidence taken from Harmelin corroborated his heavy involvement in the drug trade: marijuana cigarettes, four brass cocaine straws, a cocaine spoon, 12 Percodan tablets, 25 tablets of Phendimetrazine Tartrate, a Motorola beeper, plastic bags containing cocaine, a coded address book, and $3,500 in cash. The Court found it undeniable that violent crime is linked to drug use, possession, and distribution. Thus, Harmelin's crime was viewed as one involving violence to society as a whole.

When we look at the realities of DePiano's crime, however, we see that this was an attempted suicide-infanticide. "[A] suicide gesture ... something calling for help" is how the prosecutor presented it to the jury. As the state points out, the statute in question did not require that this woman specifically intend to harm her children. But personal culpability, including state of mind, should be a factor in our proportionality determination. *See Solem,* 463 U.S. at 293, 103 S.Ct. at 3011 ("A court, of course, is entitled to look at a defendant's motive in committing a crime."); *Bartlett II,* 171 Ariz. at 307, 830 P.2d at 828. DePiano's mental state at the time of the crime was certainly not that of an evil and wicked person. As the prosecution continually conceded, DePiano's intentions were those of someone trying to take her own life: "The children [were] in danger

because of her actions against herself. It is not the typical abuse where it is an act against the child." *See State v. Williams,* 175 Ariz. 98, 103, 854 P.2d 131, 136 (1993) (holding that § 604.01 enhancements apply only when a child is the person against whom the crime is directed).

The state presented considerable evidence that DePiano was extremely depressed and despondent, someone who had previously been admitted to a mental hospital and left against medical advice. She was called "a troubled person, troubled person with a troubled mind." The emergency room doctor described her demeanor on the date of this incident as very flat, continuous, monotonous, and consistent with that of someone suffering extreme depression. The entire picture is of a disturbed young woman who needs help, not 34 years in prison. Her children have been taken and her parental rights severed. There is no evidence that she poses a continuing threat to them or anyone else. How then can it be said that the punishment fits the crime?

I do not mean to suggest that we can or should ignore the legislature's choice of how to treat certain conduct or the prosecutor's discretion in filing criminal charges. It must be remembered, however, that despite the latitude afforded, "[a] prosecutor has the responsibility of a minister of justice and not simply that of an advocate." ER 3.8 cmt., Arizona Rules of Professional Conduct, Rule 42, Ariz.R.Sup.Ct. Furthermore, although we must "acknowledge the legislature's prerogative to criminalize behavior and to choose the appropriate punishment," *Bartlett II,* 171 Ariz. at 308, 830 P.2d at 829, we should be mindful that "the legislature, in enacting § 13–604.01, was attempting to respond effectively to those predators who pose a direct and continuing threat to the children of Arizona." *Williams,* 175 Ariz. at 102, 854 P.2d at 135. Shocking examples of such predatory abuse can be found in our caselaw. *See, e.g., State v. Poehnelt,* 150 Ariz. 136, 722 P.2d 304 (App.1985) (10.5 years for abuse of girl found hog-tied and gagged, and who had been severely deprived of food for a period of years resulting in various permanent injuries); *State v. Webb,* 140 Ariz. 321, 681 P.2d

473 (App.1984) (aggravated concurrent terms of 10 and 15 years for defendant who pled guilty to 2 counts of child molestation that included the use of physical violence and who had prior convictions for attempted rape, 3 counts of child molesting, and 2 counts each of sexual assault and kidnapping). This case is clearly not in the same universe.

DePiano is not a child predator. Not one witness testified to ever seeing her hit, scold, or "abuse" her children in any way. In fact, prosecution and defense witnesses all described her as a good mother who worked at being a better parent. The children were described as well-mannered and fun-loving, always clean, healthy, well taken care of, and well-groomed. DePiano also comes before the court without any prior convictions.

While the definition of the crime charged encompasses defendant's actions, this is one of those rare cases in which the extreme sentence is grossly disproportionate to the circumstances of the offense. DePiano received two 17–year consecutive sentences to be served without any apparent possibility of suspension, commutation, probation, pardon, parole, work furlough, or other form of early release. *See* former A.R.S. §§ 13–604.01(B), (E) & (J). Unlike in *Harmelin,* the potential injustice of this broad sentencing scheme cannot be averted or corrected by executive or legislative clemency. *See Harmelin,* 501 U.S. at 1008, 111 S.Ct. at 2709; former A.R.S. § 13–604.01(E); *see also Solem,* 463 U.S. at 300–03, 103 S.Ct. at 3015–16 (chance of commutation does not render sentence less cruel and unusual).

The legislature has recognized this flaw and amended § 13–604.01 to permit commutation. *See* A.R.S. § 13–604.01(E). The amendment, however, applies to crimes committed after January 1, 1994. *See* Laws 1993, Ch. 255, §§ 98, 99. For defendant, then, only this court can ensure that she receives a constitutional and just sentence. *See supra* at 29, 926 P.2d at 496. Thirty-four years, to be served in its entirety for a single act of desperation by a depressed and hopeless individual that resulted in no physical harm, is neither.

Having found an inference of gross disproportionality, an intra- and inter-jurisdictional analysis is necessary to validate the result. *Harmelin,* 501 U.S. at 1005, 111 S.Ct. at 2707; *Bartlett II,* 171 Ariz. at 304, 310, 830 P.2d at 825, 831. First, we compare the sentences imposed on other criminals in Arizona. "If more serious crimes are subject to the same penalty, or to less serious penalties, that is some indication that the punishment at issue may be excessive." *Solem,* 463 U.S. at 291, 103 S.Ct. at 3010. The inquiry is not limited to only those crimes encompassed within the challenged sentencing statute. *State v. Jonas,* 164 Ariz. 242, 249–50, 792 P.2d 705, 712–13 (1990).

Without repeating the persuasive analysis contained in Judge Gerst's dissent below, *State v. DePiano,* 187 Ariz. 41, 926 P.2d 508 (App.1995), it is clear that offenses more serious than the one DePiano committed result in lesser presumptive sentences, even when charged as dangerous crimes:

> Class 1 felony—15 years: Second degree murder (A.R.S. § 13–1104);

> Class 2 felonies—10.5 years: Attempted Murder (A.R.S. § 13–1001); Kidnapping (A.R.S. § 13–1304); Sexual Assault (A.R.S. § 13–1406); First Degree Burglary of a Residential Structure (A.R.S. § 13–1508); Arson of an Occupied Structure (A.R.S. § 13–1704);

> Class 3 felonies—7.5 years: Manslaughter (A.R.S. § 13–1103); Aggravated Assault (A.R.S. § 13–1204).

With the exception of second degree murder and sexual assault, all of the above sentences are subject to early release. Even the murderer of a victim under age 15 sentenced to life imprisonment is eligible for release after 35 years. *See* A.R.S. § 13–703(A). Moreover, life sentences for first degree murder can be served concurrently. Incredibly, had both of her children died, DePiano would have been eligible to receive a sentence comparable to that she now faces. Unquestionably, the punishments imposed for more serious crimes in Arizona can be less severe than the 34 flat years Depiano received.

Finally, Arizona has by far the most severe punishment in the country for intentionally placing a child in a situation likely to cause death or serious physical injury. Although

this is not dispositive, it reinforces our finding of gross disproportionality. *See Harmelin,* 501 U.S. at 1000, 111 S.Ct. at 2704. As Judge Gerst's dissent points out, "[d]efendant's consecutive, mandatory 17–year sentences stand in stark contrast to punishment for the same act in other states." *DePiano,* 187 Ariz. at 56, 926 P.2d at 523.

Ten states hold a caretaker liable only if the child suffers physical or mental injury. *See, e.g.,* Ga.Code Ann. § 16–5–70 (Supp. 1995) (cruel or excessive physical or mental injury). Of the "non-injury" states, only five require prison time exceeding one year, with the maximum sentence being 10 years. *See* Ala.Code § 26–15–3 (1975); Idaho Code § 18–1501(1) (1987); Ky.Rev.Stat. Ann. § 508.100(1)(b) (Michie/Bobbs–Merrill 1990); N.J. Stat. Ann. § 2C:24–4 (West 1995); N.M. Stat. Ann. § 30–6–1(C) (Michie 1978). Furthermore, in about one-third of the jurisdictions that do not require injury, there is a 1–year maximum sentence; in two-thirds, a 5–year maximum; and none have maximum sentences over 10 years. Finally, almost every other jurisdiction allows probation.

Having performed the constitutionally-mandated analysis of defendant's claim, I find this the "exceedingly rare" circumstance in which a sentence is cruel and unusual under the Eighth Amendment to the United States Constitution and art. 2, § 15 of the Arizona Constitution. *See Bartlett II,* 171 Ariz. at 311, 830 P.2d at 832 (recognizing the possibility that Arizona's cruel or unusual clause is broader than the federal constitution's).

Defendant's consecutive 17–year prison terms without possibility of early release should be vacated, and the case remanded to the trial court for resentencing under A.R.S. §§ 13–701 and –702 (unenhanced sentencing guidelines with parole, probation, and concurrent sentences available), treating DePiano as a class 2 or 3 felon.

FELDMAN, C.J., concurs.